William YARETSKY, et al., Plaintiffs,

and

Mary Foley, et al., Plaintiff-Intervenors,

v.

Barbara BLUM, et al., Defendants,

and

The Bronx Professional Standards Review Organization, Inc., et al., Defendants-Intervenors.

No. 76 Civ. 3360 (CBM).

United States District Court,
S. D. New York.

April 8, 1981.

The Legal Aid Society, Civil Appeals &
Law Reform Unit by John E. Kirklin and

David Goldfarb, New York City, Charles Robert, Hempstead, N. Y., for plaintiffs.

Epstein, Becker, Borsody & Green, P.C. by Jeffrey Becker, New York City, for defendants-intervenors.

## MEMORANDUM OPINION AND ORDER

MOTLEY, District Judge.

Plaintiff has moved for disqualification of the law firm currently representing various organizations which have intervened in this action as defendants. For the reasons given below, the motion is granted.

*Prior Proceedings and Factual Background*

The facts relevant to this disqualification motion must be prefaced by a description of the somewhat involved procedural posture of this action. This case is a class action brought on behalf of all recipients of aid under the New York State Plan for Medical Assistance To the Needy who are residents or patients of skilled nursing home facilities. Defendants are various state officials with responsibility for administering social services in New York State. The "intervenor-defendants" are four non-profit corporations established pursuant to the Social Security Act as professional standards review organizations (PSRO's), to monitor delivery of health care in long-term care nursing facilities. *See* 42 U.S.C. § 1320c–1 *et seq.*

On May 26, 1979, plaintiffs and defendants entered into a Stipulation of Consent to Partial Final Judgment (the Stipulation). On October 17, 1979, plaintiffs and defendants entered into an Addendum Concerning Monitoring (the Addendum), which became part of the Stipulation. Together the Stipulation and the Addendum establish certain procedures governing the transfer of patients from a skilled nursing facility to a facility providing a lower standard of care. On that same day, October 17, 1979, this court ordered the entry of the Stipulation and Addendum as a partial final judgment.

On September 17, 1979, before entry of the Stipulation and Addendum as a partial final judgment, the four PSRO's who would subsequently become the intervenor-defendants entered into Memoranda of Understanding (MOU's) with defendants. These MOU's concerned review of long-term care, including care rendered in skilled nursing facilities. *See* 42 U.S.C. § 1320c–20(a)(1). On March 25, 1980, plaintiffs moved this court for an order invalidating any MOU's which did not contain procedures similar to those found in the Stipulation. Plaintiffs also sought to permanently enjoin defendants from entering into any future MOU's which did not contain the procedures set forth in the Stipulation and Addendum.

On April 16, 1980, the four PSRO's which entered into the disputed MOU's with defendants moved to intervene in this action. The motion to intervene was made as of right, and was unopposed. Plaintiffs then moved on May 1, 1980 for an order to declare the intervenor-defendants bound by the terms of the Stipulation and Addendum, as well as a permanent injunction prohibiting intervenor-defendants from entering into any future MOU's which did not contain the procedures found in the stipulation.

On June 9, 1980, this court filed a memorandum decision which: (1) declared the existing MOU's invalid, and (2) enjoined defendants from entering into any further MOU's with intervenor-defendants without requesting incorporation of the terms contained in the Stipulation. The June 9, 1980, memorandum decision also explained this court's refusal to enforce the terms of the Stipulation against the intervenor-defendants, essentially because the PSRO's had not been party to any of the proceedings which resulted in the entry of a Partial Final Judgment embodying the terms of the Stipulation and the Addendum.

Since their entry into this action, intervenor-defendants have been represented by the law firm of Epstein, Becker, Borsody & Green (EBB&G). In October, 1979, EBB&G hired Phillip Gassel as an associate. During the period from October, 1974, until shortly before his employment with EBB&G, Mr. Gassel was a staff attorney at Legal Services for the Elderly Poor (LSEP). LSEP

has served as one of the primary sources of legal counsel for plaintiffs since the inception of this lawsuit, although they ceased to represent plaintiffs after Mr. Gassel went to EBB&G. While at LSEP, Mr. Gassel was directly involved in a very substantial fashion with the preparation for, and litigation of, this suit on plaintiffs' behalf.

### The Applicable Law

Understandably, plaintiffs initially relied on the Second Circuit's recent decision in *Cheng v. GAF Corporation*, 631 F.2d 1052 (2d Cir. 1980) (*Cheng*), as legal support for the instant motion. *Cheng* bears a startling similarity to this case. It involved the same law firm, EBB&G, and the same associate at EBB&G, Mr. Gassel. In *Cheng*, plaintiff brought a suit in 1977 alleging employment discrimination by GAF Corp. Plaintiff was represented by LSEP. GAF Corp. was represented by EBB&G. As previously mentioned, Mr. Gassel left LSEP in October 1979, to become an associate at EBB&G. Cheng then moved to disqualify EBB&G from representing GAF Corp. The Second Circuit concluded that EBB&G should be disqualified, and Judge Meskill wrote a detailed opinion. Unfortunately, this court may no longer look to *Cheng* for guidance in deciding the instant motion because the judgment in *Cheng* was recently vacated by the Supreme Court. See 450 U.S. 903, 101 S.Ct. 1338, 67 L.Ed.2d 327 (1981).

■ The Order vacating the judgment in *Cheng* reads in its entirety:

> The petition for a writ of certiorari is granted. The judgment is vacated and the case is remanded to the United States Court of Appeals for the Second Circuit with instructions that the appeal be dismissed. *Firestone Tire and Rubber Co. v. Risjord*, 449 U.S. 368, 101 S.Ct. 669, 66 L.Ed.2d 571 (1981).

A reading of *Firestone Tire and Rubber Co. v. Risjord*, 449 U.S. 368, 101 S.Ct. 669, 66 L.Ed.2d 571 (1981), (*Risjord*) demonstrates that the Supreme Court's action in vacating the *Cheng* judgment should not be interpreted as a decision on the merits. In *Risjord* the Supreme Court held that hence-

forth, lower court decisions granting motions to disqualify counsel would be considered unappealable interlocutory orders. *Id.* Thus, it seems clear that *Cheng* was reversed and remanded because *Risjord* compelled the conclusion that the Second Circuit did not have jurisdiction to consider the appeal of the trial court's decision to disqualify EBB&G. Nevertheless, the judgment was vacated, and so *Cheng's* current precedential value, if any, is doubtful.

The next pertinent authority which this court would ordinarily consider is the Second Circuit's recent *en banc* decision in *Armstrong v. McAlpin*, 625 F.2d 433 (2d Cir. 1980) (McAlpin). However, *McAlpin* was also recently reversed and remanded by the Supreme Court. See 449 U.S. 1106, 101 S.Ct. 911, 66 L.Ed.2d 835 (1981). As with *Cheng*, the *McAlpin* reversal was a one-sentence order citing *Risjord*. Again, the reversal seems clearly to rest on jurisdictional grounds, but just as clearly the Supreme Court's action prevents this court from referring to *McAlpin* as controlling authority in deciding the instant disqualification motion.

■ Accordingly, this court will apply the principles described in the Second Circuit's next most recent decision involving attorney disqualification, *Board of Education of the City of New York v. Nyquist*, 590 F.2d 1241 (2d Cir. 1979) (*Nyquist*). *Nyquist* sets a fairly high standard which must be met before disqualification is proper. The decision states in pertinent part:

> ... with rare exceptions, disqualification has been ordered only in essentially two kinds of cases: (1) where an attorney's conflict of interest in violation of Canons 5 and 9 of the Code of Professional Responsibility undermines the court's confidence in the vigor of the attorney's representation of his client, ... or, more commonly (2) where the attorney is at least potentially in a position to use privileged information concerning the other side through prior representation, for example, in violation of Canons 4 and 9, thus giving his present client an unfair advantage.

590 F.2d at 1246 (footnotes, citations omitted). Thus, the inquiry facing this court is whether Mr. Gassel's employment at EBB&G creates the potential that intervenor-defendants will obtain an unfair advantage due to Mr. Gassel's possession of confidential information about plaintiff's position. As described below, this court feels that Mr. Gassel's presence at EBB&G poses a considerable risk that client confidences will be disclosed in violation of Canon 4 of the Code of Professional Responsibility (Code).[1] Moreover, EBB&G's continued representation of intervenor-defendants definitely creates an appearance of impropriety in violation of Canon 9.[2]

### Use of Privileged Information

■ In order to determine whether EBB&G must be disqualified, this court must first determine whether Mr. Gassel himself is disqualified from representing defendant-intervenors. The appropriate test to be applied has come to be known in this Circuit as the "substantially related" test. The phrase comes from an opinion by Judge Weinfeld of this court in a case where a lawyer was attempting to represent a client with interests adverse to those of a former client. Judge Weinfeld stated that:

> the former client [must] show no more than that the matters embraced within the pending suit wherein his former attorney appears ... are substantially related to the matters or cause of action where the attorney previously represented him, the former client. The court will assume that during the course of the former representation, confidences were disclosed ... Only in this manner can the lawyer's duty of absolute fidelity be enforced and the spirit of the rule ... be maintained.

*T. C. Theatre Corp. v. Warner Bros. Pictures*, 113 F.Supp. 265, 268–269 (S.D.N.Y. 1953). This test has been consistently endorsed by the Second Circuit, and specifically applied in cases involving alleged access to privileged information derived from prior representation. *See Fund of Funds, Ltd. v. Arthur Andersen & Co.*, 567 F.2d 225, 235 (2d Cir. 1977) (and case cited therein); *Emle Industries, Inc. v. Patentex, Inc.*, 478 F.2d 562 (2d Cir. 1973).

■ Preliminarily, defendant-intervenors suggest that this test is inapplicable because the privileged information allegedly possessed by Mr. Gassel, according to affidavits in support of this motion, was all derived from discussions with other lawyers from LSEP, rather than members of the plaintiff class. There is no support for this proposition, and the court rejects it. No satisfactory explanation is offered for why the considerations of Canon 4 should not apply with equal force to both information concerning legal theories and confidential information derived from direct contact with clients. Plaintiffs assert that Mr. Gassel was privy to all stages of development of this litigation. Defendant-intervenors now suggest that this type of information is somehow not "confidential" for purposes of Canon 4 because it was not derived from direct contact between Mr. Gassel and members of the plaintiff class. This attempt to narrowly construe Canon 4 contravenes the spirit of the entire Code, and the dearth of support for such a position is easily understood.

■ Defendant-intervenors then assume, *arguendo*, the applicability of the "substantial relationship" test, but attempt to characterize it as a "rebuttable presumption." Intervenor-PSRO's Memorandum In Opposition to Plaintiff's Motion to Disqualify Counsel at page 20. According to defendant-intervenors, where "a matter [is] involved in the former and present representation" a rebuttable presumption arises that the attorney in question has received confidential information. The defendant-intervenors then seek to "rebut" this presumption by again pointing to the supposed distinction between information about legal theories and negotiating positions in con-

---

1. Canon 4 states: "A Lawyer Should Preserve the Confidences and Secrets of a Client."

2. Canon 9 states: "A Lawyer Should Avoid Even the Appearance of Impropriety."

trast to confidential information received directly from a client. They argue that since a significant amount of litigation and negotiation has already taken place, any advantage which might have resulted from Mr. Gassel's knowledge has already evaporated in the continuing contacts between the parties. This argument is both legally incorrect and factually unpersuasive.

First, the characterization of the "substantial relationship" test as a rebuttable presumption is incorrect. The presumption that confidential information has been received is not rebuttable. The whole point of Judge Weinfeld's formulation, subsequently adopted by the Second Circuit, is that "the former client" need "show no more than" a substantial relationship between the matters involved in the former and present actions. Once this relationship is shown, "*[t]he Court will assume* that during the course of the former representation confidences were disclosed." *Fund of Funds, Ltd. v. Arthur Andersen & Co., supra*, 567 F.2d at 235 (*quoting T. C. Theatre Corp. v. Warner Bros. Pictures, supra*, 113 F.Supp. at 268–69). (emphasis added.) Here Mr. Gassel has switched sides in the same lawsuit. The matters on plaintiffs' side of this lawsuit are clearly substantially related to the matters on defendants' side of this lawsuit.

■ Even if defendant-intervenors' interpretation of the "substantial relationship' test were correct, their attempts to rebut the presumption they have created are not persuasive on the instant facts. In a supporting affidavit, one of plaintiffs' counsel gives a detailed description of the types of information in Mr. Gassel's possession. *See* Affidavit of John E. Kirklin at ¶¶ 5 and 6. For instance, plaintiffs make the uncontested assertion that Mr. Gassel was "primarily responsible for developing the expert statistical testimony on which plaintiffs intended to rely at trial." *Id.* Moreover, Mr. Gassel is credited with intimate knowledge concerning plaintiffs' future litigation strategy and plaintiffs' understanding of the consent judgment. Defendant-intervenors' position requires

this court to accept that an opposing party's interpretation of a disputed court order is not confidential information when the parties are even now negotiating over how the disputed court order is to be applied. Defendant-intervenors' position is factually unsupportable.

■ However, Mr. Gassel's assumed possession of confidential information, and his resulting personal disqualification do not end the court's inquiry. The question then becomes whether Mr. Gassel's disqualification requires the disqualification of the firm with which he is associated, EBB&G. As previously mentioned, the Second Circuit has regularly referred to the American Bar Association Code of Professional Responsibility (Code) for standards to apply in dealing with disqualification motions. The Code speaks unequivocally about the situation now facing this court in Disciplinary Rule 5–105(D):

> If a lawyer is required to decline employment or withdraw from employment under a Disciplinary Rule, no partner or associate, or any other lawyer affiliated with him or his firm may accept or continue such employment."

Since Mr. Gassel himself is clearly disqualified from representing the defendant-intervenors, application of Disciplinary Rule 5–105(D) is obvious here.

However, defendant-intervenors have properly argued against a mechanical application of DR 5–105(D). They point to a number of situations in which the American Bar Association has decided against disqualification of an entire law firm simply because a single associate or partner has been disqualified. *See, e. g.,* ABA Formal Opinion 342, 62 ABA Journal 517 (1976), ABA Opinion No. 889, 31 The Record 552 (1976). These decisions are based upon screening procedures designed to insulate the disqualified individual from any contact with the particular matter at issue while it is being handled by other members of the firm. In this case, EBB&G has given the court a detailed description of the efforts now being made to screen Mr. Gassel from any contact with this case. These efforts in-

clude isolating him from conversations and communications involving this matter, as well as locking up all files generated by the case. At this point the court feels it is appropriate to state that plaintiffs have not even suggested any deliberate attempt or propensity on Mr. Gassel's part to deliberately communicate confidential information. Accordingly, prevention of such an occurrence plays no part in this decision.

Nevertheless, despite Mr. Gassel's unimpeached good character and the screening efforts undertaken by EBB&G, the court finds that on the particular facts of this case EBB&G must be disqualified. As the Second Circuit has stated, disqualification of counsel is prompted by the "need to enforce the lawyer's duty of absolute fidelity and to guard against the danger of inadvertent use of confidential information." *Ceramco, Inc. v. Lee Pharmaceuticals*, 510 F.2d 268, 271 (2d Cir. 1975). In the instant case, the law firm involved has less than thirty lawyers in its New York office. Moreover, Mr. Gassel is employed in the firm's health law section, which is also the section of the firm charged with handling this case. In other words, the relatively small group of professional colleagues with whom Mr. Gassel interacts on a daily basis are also the group of people who must screen their activities from Mr. Gassel, and who must, in turn, be screened from Mr. Gassel's disclosure, however inadvertent, of confidential information obtained by him during his tenure as an LSEP attorney. This court is very skeptical about the efficacy of any screening procedures given this situation. The court notes that its skepticism is shared by at least one panel of judges in the Second Circuit in the context of a law firm substantially larger than EBB&G. *See Fund of Funds, Ltd. v. Arthur Andersen & Co.*, 567 F.2d 225, 229 n. 10 (2d Cir. 1977).

In addition, the very extent to which Mr. Gassel was involved in this case on the other side while at LSEP makes his screening virtually impossible at this stage. For instance, a dispute broke out between plaintiffs and defendants concerning certain conversations which were alleged to have taken place between the parties. At the request of plaintiffs' counsel, Mr. Gassel prepared an affidavit about a conversation he had with defendants' counsel while he was employed at LSEP. Mr. Gassel prepared the affidavit with EBB&G's permission. In the same vein, it is certainly not impossible that Mr. Gassel could be called as a witness should this matter result in further litigation. Each of these situations has, or would, force contact between Mr. Gassel and EBB&G lawyers in the context of discussing this case. Surely no "Chinese Wall" could survive such an assault.

### The Appearance of Impropriety

■ As this court reads the applicable law of the Second Circuit, the appearance of impropriety in violation of Canon 9 would not, standing alóne, be sufficient to require disqualification. *See Board of Education v. Nyquist, supra,* 590 F.2d 1241. Clearly this position is motivated by solicitude for a party's right to choose his own counsel, and an appreciation of the dislocation caused by disqualifying counsel once an action has begun. However, these considerations must be balanced with "the need to maintain the highest standards of the profession." *Government of India v. Cook Industries, Inc.,* 569 F.2d 737 (2d Cir. 1978). These standards take on practical importance in preserving the public's confidence in the legal profession. *See Emle Industries, Inc. v. Patentex, Inc.,* 478 F.2d 562, 565 (2d Cir. 1973). This court would be hard pressed to explain to a lay person how it was in fact proper for a lawyer who was substantially involved with the prosecution of a lawsuit to switch sides in the middle of the action. The appearance of impropriety is incontrovertible on the instant facts, and serves as an important additional reason for disqualification of EBB&G.

### The Timing of the Disqualification Motion

■ Defendant-intervenors have also disputed the timing of this motion. They have attempted to characterize it as alternatively too late or too early. Laches al-

legedly results from plaintiffs' failure to move until approximately five months after defendant-intervenors entered this action. At the court's request, plaintiffs submitted further papers to explain this five-month lapse. In a reply memorandum the various plaintiffs' counsel explain that the instant motion was prompted by the Second Circuit's recent decision in *Cheng v. GAF Corp., supra*, in which plaintiff there prevailed on a disqualification motion also involving Mr. Gassel and EBB&G. Although plaintiffs' counsel could have had a bit more of the courage of their convictions, this explanation certainly makes sense. Before *Cheng*, during the period of time relevant here, controlling Second Circuit authority for the instant motion would have been the *en banc* opinion in *Armstrong v. McAlpin, supra*. As previously discussed, both *McAlpin* and *Cheng* were subsequently vacated by the Supreme Court, but while it retained precedential value, *McAlpin* would certainly have been a considerable obstacle for plaintiffs to overcome in an effort to disqualify EBB&G.

In the alternative, defendant-intervenors assert this motion is not necessary unless present negotiations between the parties prove unsuccessful and further litigation takes place. This argument must be rejected for the same reasons defendant-intervenors offer to illustrate how the equities of this situation mitigate against disqualification. The papers opposing this motion go on at length to describe the tremendous problem defendant-intervenors would have finding suitable counsel to replace EBB&G. Since the court has already decided in favor of disqualifying EBB&G, each passing day increases the amount of material which will have to be absorbed by replacement counsel. Waiting until the eve of trial is untenable.

For the reasons just given, this court concludes that EBB&G is "at least potentially in a position to use privileged information" obtained from "the other side through prior representation" and, therefore, must be disqualified from further par-

ticipation in this action. *Board of Education v. Nyquist, supra*, at 590 F.2d 1246.

SO ORDERED.